*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 1, 2024

Plaintiff-Appellee,

v

No. 360987
St. Clair Circuit Court
LC No. 96-000245-FC

MARK ALLEN PORTER,

Defendant-Appellant.

Before: CAVANAGH, P.J., and RICK and PATEL, JJ.

PER CURIAM.

Defendant appeals by leave granted[1] the trial court's order denying his motion under MCL 770.16 regarding the inspection and testing of physical evidence. Defendant was previously convicted of two counts of first-degree felony murder, MCL 750.316(1)(b), one count of first-degree home invasion, MCL 750.110a(2), and one count of unlawfully driving away an automobile, MCL 750.413. Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to life without parole for the murder convictions, life for the home invasion conviction, and 10 to 15 years' imprisonment for the unlawfully driving away an automobile conviction. We reverse the order denying defendant's motion and remand for proceedings consistent with this opinion.

---

[1] This Court originally denied defendant's application for leave to appeal for lack of merit in the grounds presented. See *People v Porter*, unpublished order of the Court of Appeals, entered September 29, 2022 (Docket No. 360987). However, our Supreme Court issued an order remanding the matter to this Court for consideration as on leave granted; the order shows that Justice Zahra and Justice Viviano would have denied the application for leave to appeal. See *People v Porter*, 511 Mich 970 (2023).

## I. FACTUAL BACKGROUND

The relevant facts were summarized in this Court's previous opinion in this case, *People v Porter*, unpublished per curiam opinion of the Court of Appeals, issued March 16, 1999 (Docket No. 202855), p 1 (*Porter I*), as follows:

> This case arises from the September 28, 1995, murders of George and Dorothy Wendel, a wealthy elderly couple who resided in Marysville. Their home was broken into and one of their vehicles, some cash, and jewelry, were stolen. Although no physical evidence linked any suspect to the crime, circumstantial evidence led to defendant's arrest and conviction. Defendant first became a suspect when his sister, Donna Cataldo, contacted police and indicated that she believed that defendant either committed the murders or was involved in the murders.[1] Defendant was arrested three days after the murders on an unrelated warrant for prison escape, and had in his possession at that time two rings belonging to Dorothy Wendel. Defendant subsequently made a statement to police regarding the location of the jewelry stolen from the Wendel home. In addition, three inmates with whom defendant was incarcerated at various times informed police that defendant had related to them his involvement in the murders, and at least two witnesses observed defendant with a large amount of cash in the days after the murders. A warrant for defendant's arrest for the present crimes was issued on January 4, 1996.
>
> ---
>
> [1] The day before the murders, defendant, who was on escape status from the Department of Corrections, visited Cataldo's home for the first time in three years. He questioned her about elderly people for whom she used to work, inquiring whether they would pay cash for odd jobs. The Wendels' names were mentioned in the conversation.

The opinion further provided that, "Witnesses testified that Dorothy's Wendel's bedroom, where the physical assault of Dorothy clearly occurred, was strewn with a large amount of blood. However, all of the blood tested matched Dorothy's Wendel's blood[,]" and "Michigan State Police crime lab experts testified that the assailant must have worn gloves and a hat because no hair, fingerprint, or trace evidence inconsistent with that of the victims was found." *Porter I*, unpub op at 9 nn 7-8.

On February 8, 2022, defendant filed a motion under MCL 770.16 for inspection and testing of physical evidence, requesting the trial court to order the Marysville Police Department to provide defendant's forensic DNA expert, Dr. Greg Hampikian, with the duct tape used to bind the victims so that Dr. Hampikian could determine whether there was sufficient biological material to develop a DNA profile. Defendant contended that (1) MCL 770.16 permitted incarcerated defendants convicted of a felony to petition a trial court to order the inspection and DNA testing of biological material discovered during the course of the criminal investigation, (2) he satisfied the aforementioned requirement because the duct tape recovered from the crime scene likely contained biological material due to its "sticky nature," which may include "touch DNA," i.e., DNA found in skin cells left behind after a person touched an object, and (3) MCL 770.16(4)(a) mandated a defendant establish prima facie proof that the evidence subject to testing is material to the defendant's identity as the perpetrator of the underlying offense, which defendant satisfied here

because the offender used the duct tape to bind and gag the victims and, if the DNA testing produced a profile matching a person other than defendant, it would be exculpatory. In his motion, defendant further argued that he maintained a due process right under Michigan's postconviction procedures to access and inspect potentially exculpatory evidence. Following a hearing on defendant's motion under MCL 770.16, the trial court denied the motion on statutory and due process grounds. This appeal followed.

## II. MCL 770.16

Defendant argues that the trial court erred when it denied his motion under MCL 770.16 regarding the inspection and testing of physical evidence because defendant plainly demonstrated that the duct tape recovered from the crime scene satisfied the statutory scheme. We agree.

"Any questions of law, including questions of statutory interpretation, are reviewed de novo." *People v Thurmond*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 361302); slip op at 2.

Under MCL 770.16(1), "a defendant convicted of a felony at trial before January 8, 2001 who is serving a prison sentence for the felony conviction may petition the circuit court to order DNA testing of biological material identified during the investigation leading to his or her conviction, and for a new trial based on the results of that testing. . . ." MCL 770.16(4) further dictates the following:

> (4) The court shall order DNA testing if the defendant does all of the following:
>
> (a) Presents prima facie proof that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of, or accomplice to, the crime that resulted in the conviction.
>
> (b) Establishes all of the following by clear and convincing evidence:
>
> (*i*) A sample of identified biological material described in subsection (1) is available for DNA testing.
>
> (*ii*) The identified biological material described in subsection (1) was not previously subjected to DNA testing or, if previously tested, will be subject to DNA testing technology that was not available when the defendant was convicted.
>
> (*iii*) The identity of the defendant as the perpetrator of the crime was at issue during his or her trial.

If the court orders a test and the results are inconclusive or show that the defendant is the source of the material, the court shall deny the motion for new trial. MCL 770.16(7)(a). If the results show that the defendant is not the source of the material, the court must determine whether a new trial is justified in the manner prescribed under MCL 770.16(8).

Defendant disputes the trial court's interpretation of several provisions of MCL 770.16. Defendant first argues that the court incorrectly determined that he failed to establish "biological material was collected during the investigation of the defendant's case" under MCL 770.16(3) because it imposed an additional requirement that an expert make an initial determination that *a particular type* of biological material was acquired—which is against the plain language of the statute. Defendant further notes that the trial court refused to examine the crime scene photographs to confirm whether the duct tape was saturated in blood, or featured any hair, so as to warrant further inspection or testing of evidence that clearly contained at least two types of previously identified biological material.

> The overriding goal of statutory interpretation is to ascertain and give effect to the Legislature's intent. The touchstone of legislative intent is the statute's language. The words of a statute provide the most reliable indicator of the Legislature's intent and should be interpreted on the basis of their ordinary meaning and the overall context in which they are used. An undefined statutory word or phrase must be accorded its plain and ordinary meaning, unless the undefined word or phrase is a "term of art" with a unique legal meaning. [*People v Ryan*, 295 Mich App 388, 400; 819 NW2d 55 (2012) (quotation marks and citation omitted).]

Defendant sought the inspection of the duct tape to determine whether it contained any residual touch DNA, a type of biological material distinct from the blood and hair originally identified on the DNA-stained evidence. MCL 770.16(3) provides, in pertinent part:

> A petition under this section shall allege that biological material was collected and identified during the investigation of the defendant's case. . . . If the court determines that identified biological material was collected during the investigation, the court shall order appropriate police agencies, hospitals, or the medical examiner to search for the material and to report the results of the search to the court.

The plain language of MCL 770.16(3) does not specify the precise type of biological material sufficient to qualify for postconviction inspection or testing; rather, the statute mandates that a form of biological material was collected during the preliminary investigation. According to the Marysville Police Department report, and the accompanying laboratory report, the sections of duct tape defendant seeks to have inspected retained blood and hair, which are two distinct types of biological material. Furthermore, while touch DNA was not previously identified on the duct tape, the Marysville Police Department attempted to test the duct tape for latent fingerprints, which failed to yield any notable results. And despite the trial court's assertion that defendant's argument regarding the existence of touch DNA on the duct tape was purely speculative because the evidence at trial indicated gloves were worn throughout the execution of the underlying offenses, the affidavit of Dr. Hampikian indicated otherwise. Dr. Hampikian stated that (1) the limited DNA-testing technology in existence at the time of the original criminal investigation was generally incapable of recovering any touch DNA despite its possible presence, and (2) because touch DNA included residual skin cells from a person handling an object, the adhesive nature of the duct tape rendered it a good medium to retain biological material because the perpetrator would likely have removed his or her gloves to handle the sticky item.

Defendant additionally argues that the trial court misinterpreted MCL 770.16(3) by mandating that he demonstrate, through an expert, that the duct tape contains the skin cells required for testing—while it simultaneously refused to allow an expert to examine the evidence in the first place. Previous caselaw addressing MCL 770.16 has traditionally involved the postconviction inspection and testing of the exact biological material identified during the course of the original criminal investigation. See *People v Poole (On Remand)*, 311 Mich App 296, 307-309; 874 NW2d 407 (2015) (the defendant requested the inspection and testing of blood samples recovered from stones and grass near the crime scene during the original investigation); see also *People v Barrera*, 278 Mich App 730, 732-734; 752 NW2d 485 (2008) (the defendant sought the release and inspection of biological material identified on a vaginal swab, vaginal smear, quilt, shorts, and panties collected during the initial criminal investigation). However, it would be counterintuitive to enact a statute for the purpose of allowing incarcerated defendants to seek postconviction testing of potentially exculpatory evidence while simultaneously barring defendants from access and inspection of said evidence for previously unidentifiable biological material. As defendant argues, testing was not the primary matter before the trial court; rather, defendant was solely requesting the inspection of the duct tape as a precursor to possible DNA testing and, if the inspection revealed there were no skin cells embedded in the duct tape, then the matter was concluded.

Defendant also argues that the trial court further misconstrued MCL 770.16(4)(a)—which requires a court to order DNA testing if the defendant "presents prima facie proof that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of the crime," when it concluded that the possibility the blood on the duct tape may have belonged to the victims as opposed to the perpetrator indicated defendant failed to satisfy the aforementioned statutory provision. In *Poole*, the defendant requested the inspection of blood samples recovered from stones and grass located at the crime scene, despite the previous blood typing results revealing nearly all of the blood was consistent with the victim's blood type, because a specific blood stain on the stone matched neither defendant nor the victim. *Poole*, 311 Mich App at 307-309. This Court determined, per MCL 770.16(4)(a), that "[b]ecause DNA testing of a blood sample could possibly connect another person to the crime scene or exclude defendant, the sample would be of some consequence or have a logical relationship to the issue of identity and would be linked to both the crime and the criminal[,]" despite the previous blood testing results. *Id.* at 309. Similarly, while the blood and hair recovered in the instant case reportedly belonged to the victims, any recoverable touch DNA on the duct tape used to bind and gag the victims may connect a third party to the crime scene, which is critical to the identity of the perpetrator because no physical evidence tied defendant to the crime scene and the police department suspected the offender wore gloves and a hat. Furthermore, according to the affidavit of Dr. Hampikian, the adhesive nature of the duct tape used to bind and gag the victims rendered the medium a "good candidate to bind and retain usable DNA samples. Additionally, given its stickiness, it's quite plausible that the perpetrator(s) would have taken off their gloves while handling the tape."

MCL 770.16(4)(a) requires a defendant to establish that the evidence—not the biological material itself—subject to inspection or testing is material to the identity of the perpetrator. However, the trial court's interpretation of MCL 770.16(4)(a) would erroneously impose the materiality element onto the biological material identified under MCL 770.16(3), despite the broader statute clearly distinguishing between the two terms because MCL 770.16(4)(a) uses the term "evidence" while MCL 770.16(3) uses the term "biological material." Furthermore, the term

"biological material" is used over 20 times throughout the statute while the term "evidence" is only used a few times, which indicates the Legislature intended to differentiate between the two words. See *Walt Disney Co v Eubanks*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 360291); slip op at 6 ("The use of these distinct words in specific contextual situations indicates the Legislature's intent that these words mean different things."); see also *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 293; 952 NW2d 358 (2020) (stating that when the Legislature uses different words, the words are generally intended to connote different meanings). And a reading of MCL 770.16 that allows for the inspection and testing of material evidence, as opposed to imputing the materiality element to the biological material itself, would also be more consistent with Michigan case law governing the matter. See *Poole*, 311 Mich App at 308 (noting, "[t]he 'materiality' would be established from the *evidence* showing a violent physical attack involving a knife and an ensuing struggle that could have easily resulted in the perpetrator being cut or scratched, thereby spilling some of the perpetrator's own blood in the process of the killing") (emphasis added); see also *Barrera*, 278 Mich App at 738 (determining, "[the] defendant must show that *all the items containing DNA matter* he seeks to be tested are material to establishing the identity of the perpetrator of the rape. To do so, defendant must link *the DNA-stained evidence* to both the crime and the criminal.") (emphasis added). Because defendant satisfied MCL 770.16(3) by showing biological materials were found on the duct tape at the time of the original investigation, he is eligible to inspect the duct tape under MCL 770.16(4), because it is undisputed that the perpetrator of the underlying offenses used the duct tape to bind the victims, and any biological material recovered therein is relevant to determining the perpetrator's identity.

With regard to MCL 770.16(4)(b), defendant demonstrated the identified biological material, the blood and hair on the duct tape, existed at the time of the original adjudication, however, the then-prevalent technology was incapable of analyzing the duct tape for touch DNA due to its sensitive nature. The affidavit of Dr. Hampikian stated that there were significant advancements in the realm of DNA testing with respect to the sensitivity and accuracy of the procedures and forensic technology available since 1995, which did not come into prominence until 2007.

Ultimately, regarding the substance of defendant's motion under MCL 770.16, we conclude that, as required under (1) MCL 770.16(1), defendant was convicted of a felony at trial before January 8, 2001, and is currently incarcerated for the conviction; (2) MCL 770.16(2), defendant's motion was filed in the appropriate sentencing court; (3) MCL 770.16(3), biological material was collected and identified during the police investigation of defendant's case; (4) MCL 770.16(4)(a), defendant presented prima facie proof that the evidence sought to be tested was material to the question of defendant's identity as the perpetrator of the murders; (5) MCL 770.16(4)(b)(*ii*), there is clear and convincing evidence that the biological material was not previously subjected to DNA testing; and (6) MCL 770.16(4)(b)(*iii*), there is clear and convincing evidence that defendant's identity as the perpetrator was at issue during his trial. Therefore, the trial court should have granted defendant's motion requesting that his forensic DNA expert, Dr. Hampikian, be provided with the duct tape for inspection under MCL 770.16, in order to determine whether biological material, in the form of touch DNA, is currently detectable on the duct tape, and defendant is capable of satisfying MCL 770.16(4)(b)(*i*). Accordingly, the trial court's order denying the motion is reversed.

### III.  DUE PROCESS

Defendant also argues that the trial court erred when it determined that he did not maintain a due process right to reasonable access to potentially exculpatory evidence under Michigan's postconviction procedures.  However, because we have concluded that defendant is entitled to access the duct tape for inspection under MCL 770.16 as discussed above, we decline to address this constitutional issue.  It is well established that "constitutional issues should not be addressed where the case may be decided on nonconstitutional grounds." *People v Riley*, 465 Mich 442, 447; 636 NW2d 514 (2001).

Reversed and remanded to the circuit court for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Michelle M. Rick
/s/ Sima G. Patel